**SO ORDERED.**

**SIGNED this 03 day of February, 2010.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE
_____

**DESIGNATED FOR PUBLICATION**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| GABRIEL H. PENARAN | ) | **Case No. 09-11043** |
| | ) | **Chapter 13** |
| Debtors. | ) | |
| _____ | ) | |

**<u>MEMORANDUM OPINION</u>**

Before the Court are four issues: (1) debtor Gabriel Penaran's objection to claims 1-1 and 1-2, filed by the Illinois Department of Healthcare and Family Services (IHFS);[1] (2) confirmation of the debtor's first amended chapter 13 plan filed June 24, 2009;[2] (3) debtor's motion for "violation

---

[1] Dkt. 41.

[2] Dkt. 28.

-1-

of stay;"[3] and (4) IHFS's motion to dismiss the debtor's case.[4] The chapter 13 trustee objected to plan confirmation on feasibility grounds, among others,[5] while IHFS objected to the plan's proposed treatment of the priority child support debt.[6] The Court convened an evidentiary hearing on confirmation on September 16, 2009, but on that day, the debtor filed his objection to IHFS's claim. Because Mr. Penaran had traveled from western Kansas for the hearing, the Court received evidence relative to confirmation, but was forced to delay any further disposition in this case until the claim objection could be properly reached.[7] The Court conducted a further evidentiary hearing on December 16, 2009 when the Court heard evidence on the claim objection and IHFS's motion to dismiss. After careful review of the record taken in both hearings, the Court is now ready to rule.[8]

Jurisdiction

The allowance of claims and the confirmation of a debtor's chapter 13 plan are core proceedings, as are the motions for stay violation and to dismiss. The Court has subject matter

---

[3] Dkt. 21.

[4] Dkt. 44.

[5] Dkt. 16, 19.

[6] Dkt. 31.

[7] Because the objection was filed on the date of the confirmation hearing, the Court deferred ruling on confirmation until a claim hearing could be held. Fed. R. Bankr. P. 3007 requires that a claimant be given not less than 30 days' notice of such a hearing.

[8] Debtor appeared in person at both hearings. At the September hearing, he was represented by attorney Aaron Johnstun of Redmond & Nazar, L.L.P. Thereafter, Mr. Johnstun withdrew as counsel for the debtor. Attorney Jeffrey Rockett of the same firm appeared with Mr. Penaran at the December hearing. Alicia Holzmeister, a support enforcement attorney for the State of Kansas, appeared for IHFS and Christopher Micale appeared for the chapter 13 trustee Laurie B. Williams.

-2-

jurisdiction over these contested matters.[9]

Overview

Penaran is a below-median income debtor and owes a domestic support obligation (DSO) arrearage of nearly $49,000, inclusive of interest.[10] Penaran proposed a chapter 13 plan that provides for past-due child support that he owes to be treated as an involuntarily assigned support claim under § 507(a)(1)(B) that may be paid less than in full under § 1322(a)(4), so long as the debtor devotes all of his disposable income to the plan over a 5-year period. The debtor's first amended plan proposes to pay a total of $3,339.80 over 60 months with payments to be made pursuant to a withholding order.[11] The balance of debtor's attorney fees, $1,274 will be paid through the plan at $49 per month. Debtor has no secured debt.

Whether this plan may be confirmed hinges on the nature and validity of the IHFS child support claim and, in particular, what support priority it should be accorded under § 507(a)(1). If the claim is found to be for involuntarily assigned past-due support, the debtor may treat it as partially payable under the plan under § 1322(a)(4) and the plan may be confirmed, assuming it meets the other requirements of §§ 1322 and 1325. However, if any portion of the support claim is directly owed to Penaran's ex-wife or daughter, even if it is being collected by the state of Illinois, the directly-owed portion must be paid in full during the life of the plan as required by § 1322(a)(2) and § 507(a)(1)(A). This may render the plan unfeasible.

---

[9] *See* 28 U.S.C. § 157(b)(1), (b)(2)(A), (b)(2)(B), (b)(2)(L) and § 1334(b).

[10] There is no dispute that the debt is a DSO within the meaning of 11 U.S.C. § 101(14A), is non-dischargeable, and is a priority debt under § 507(a)(1). Penaran contends in his amended plan that the pre-petition child support arrearage is approximately $30,000.

[11] Dkt. 48. Debtor proposes to pay the sum of $83.43 for 26 months and $34.43 for 34 months.

-3-

In addition to the claim objection and confirmation matters, there is also pending a motion for violation of the stay filed by debtor against IHFS.[12] This motion is premised upon IHFS's garnishment of debtor's wages during the pendency of the case to enforce the DSO. IHFS contends that its collection activity is excepted from the automatic stay by § 362(b)(2)(B) and (C).[13] Finally, after the confirmation hearing, IHFS filed a motion to dismiss debtor's chapter 13 case for material misstatement of facts in Schedules I and J.[14] Having heard evidence on each of these matters, the Court is prepared to rule.

    A.    <u>The DSO Priority Claim</u>[15]

        I.    Facts

The debtor's objection to IHFS's original claim 1-1 was that the claim incorrectly recited §§ 507(a)(2) and 507(a)(5) as bases for its priority. The debtor also asserted that Illinois claimed a first support priority under § 507(a)(1)(A) when the child support claim was assigned by debtor's ex-wife to the state of Illinois under state law because she received Aid to Families and Dependent Children (AFDC).[16] Section 507(a)(1)(A) provides senior support priority to DSO claims that are payable directly to an individual recipient as opposed to a governmental assignee. Claims

---

[12] Dkt. 21.

[13] Dkt. 30.

[14] Dkt. 44.

[15] Dkt. 41.

[16] IHFS is a IV-D agency under the Social Security Act (42 U.S.C. § 651 *et seq.*) authorized to enforce and collect child support (including AFDC benefits received by debtor's ex-wife). A spouse who receives public assistance such as AFDC assigns all rights, title and interest in the assistance provided to the IHFS. 305 Ill. Comp. Stat. § 5/10-1 (2009); 89 Ill. Admin. Code § 160.20 (2009).

-4-

involuntarily assigned to a governmental entity are accorded second support priority under § 507(a)(1)(B) and, as such, may be treated more favorably to the debtor under § 1322(a)(4). The question before the Court therefore is whether any or all of the IHFS claim was directly payable to debtor's ex-wife.

Claim 1-1 was filed by Kansas support counsel on July 9, 2009.[17]  On its face, the claimant is titled "Illinois Department of Healthcare and Family Services, a IV-D agency with a government assignment from Ms. Shelley West f/k/a Shelley Penaran."  On the form used by the claimant are boxes to be checked to indicate the basis for the priority of the claim.  The form used for claim 1-1 appears to be a pre-BAPCPA form because it provides for child support under § 507(a)(2) and (a)(5), the pre-BAPCPA sections that accorded child support priority.  Since 2005, however, all domestic support orders take first priority under § 507(a)(1).  In Box 2, "Date Debt was incurred," claimant stated

> Signed up for Aid to Families March 1992, continued on with non-assistance based child support w/ assignment signed May 31, 2002 (which continues on) with the IVD government agency, Illinois Department of Healthcare and Family Services Division of Child Support.

The detail attached to the claim, a "Support Calculation Worksheet," appears to be a compilation of the accruing obligation and payments by year, whether made directly by Mr. Penaran or received by the state of Illinois via other collection processes.  The exhibit states that $3,430.03 in interest is due to the Department of Healthcare and Family Services while the balance, over $45,000 in unpaid support and interest, is "due to the custodial parent."

---

[17]  Ex. E.

IHFS amended its claim by filing Claim 1-2 on September 24, 2009.[18]  The claim appears to be on a current form and recites § 507(a)(1) as the basis for priority.  The creditor is named as it was in claim 1-1, but in Box 2 is inserted the following content:

> March 1992  Pursuant to the IL Statutory Notice of Assignment from the ex-spouse, Shelley Penaran/aka/Shelley West for a Domestic Support Obligation, due to the application for Aid to Families with Dependent Children in1992.  *The IL Statutory Notice of Assignment continues, but in May of 2002, the monies owed on this Domestic Support Order are due to this ex-spouse.*  In May 31, 2002 this case became a non-assistance based child support enforcement case, with the Title IVD government agency, Illinois Department of Healthcare and Family Services Division of Child Support, as the collector of the DSO for the ex-spouse. [Emphasis added].

The support document attached to claim 1-2 is identical to that attached to claim 1-1.

At trial, Gabriel Penaran testified through an interpreter.  He stated that, for as long as he knew Ms. West, she had been on public assistance.  His only child by her was born in 1989.  According to the claim documents, Penaran and Ms. West were divorced sometime in 1990 in Illinois.[19]  He stated that he had not had meaningful communication with West for nearly 10 years.  He has had no contact with his child by her (now an adult) for nearly five years.  He says that from time to time he receives correspondence from IHFS, but that he does not usually understand it.  He is aware that, at some point, the Illinois courts adjusted his child support upward.  The claim supporting detail states that his *weekly* support obligation of $46, commencing in 1990, increased to $153, commencing sometime in 2002.  He also stated that at some time in the past, he had

---

[18]  Ex. F.

[19]  A certified copy of the Illinois divorce decree was offered and admitted into evidence at the confirmation hearing in September.  *See* Ex. 1.  Pursuant to that court document, Ms West was granted a divorce, awarded child custody, and Penaran was ordered to pay weekly child support of $46.  The divorce decree was entered by default as Penaran did not appear.  This is the only pleading from the parties' 1990 divorce that was admitted into evidence.

-6-

received a refund from the State of Illinois after it seized his income tax refund and that led him to believe that he was current on his support obligations.  In fact, the claim detail does reflect a refund of $366 given sometime in 2004.  Penaran testified that he had attempted to contact the agency about modifying his obligation, but was told that it was too late for him to protest the upward adjustment.  He based the $30,000 amount scheduled for the DSO and in his plan, on correspondence he has previously received from the agency.  Neither this correspondence nor any other document referred to by Penaran in his testimony was offered into evidence.

IHFS presented no live testimony in support of its claim either as to the amount of the claim or whether it retains an assignment for repayment of AFDC assistance.  Nor did IHFS present testimony to explain the "Support Calculation Worksheet" attached to its claim.[20]  IHFS relies on the claim exhibit and on the statutes and administrative regulations enacted by Illinois to support its position that nearly all of this claim is directly owed to Ms. West and is "assigned" only for the purpose of collection on her behalf.

        ii.      <u>Analysis of Claim Objection</u>

IHFS filed a timely proof of claim and amended it.  A creditor may file a proof of claim.[21]  If a proof of claim is filed, it is deemed allowed unless a party in interest objects.[22] If a claim objection is filed, the court determines the amount of the claim as of the petition date after notice and a hearing and "shall allow such claim in such amount," except to the extent that the claim is for

---

[20]  The claim detail and supporting documentation was apparently prepared and signed by one Christina R. Maggio on July 2, 2009.  Ms. Maggio did not testify.

[21]  § 501(a).

[22]  § 502(a).

-7-

unmatured support that is excepted from discharge under § 523(a)(5).[23]  A proof of claim may be executed by the claimant's authorized agent and, when it is based on a writing, the original or a duplicate is to be supplied with the claim or the absence of such writing explained.[24]  A party may object to a claim's allowance in writing and the same must be mailed to the trustee and the claimant not fewer than 30 days before the date set for hearing.[25]  Because a claim is deemed allowed unless objected to under § 502, a rebuttable presumption of the claim's validity arises upon filing.[26]  The objecting party has the burden to go forward with the evidence to meet the presumption.  If the objecting party produces facts sufficient to demonstrate that an actual dispute regarding the claim's validity or amount exists, the burden of proof shifts to the claimant to prove in what amount its claim should be allowed.[27]  In this case, both the priority level of IHFS's claim and its amount are disputed by the debtor and the Court must apply the forgoing rules to determine its validity.

Penaran's testimony concerning the refund, which is corroborated by the claim detail, creates a disputed issue of fact about what he owes IHFS and Shelly West in either past-due child support or reimbursement for AFDC benefits.  Further, debtor objects to the IHFS's priority level of its

---

[23]  § 502(b)(5).

[24]  Fed. R. Bankr. P. 3001(b) & (c); Official Form 10. *See In re Kirkland,* 572 F.3d 838 (10th Cir. 2009).

[25]  Fed. R. Bankr. P. 3007(a).

[26]  Fed. R. Bankr. P. 3001(f).

[27]  *See In re Broadband Wireless Intern. Corp.,* 295 B.R. 140, 145 (10th Cir. BAP 2003) (The objecting party's evidence must be of probative force equal to that of the allegations contained in the proof of claim; however, an objection raising only legal issues is sufficient.); *In re Geneva Steel Co.,* 260 B.R. 517, 524 (10th Cir. BAP 2001), *aff'd* 281 F.3d 1173 (10th Cir. 2002) (same); *In re Harrison,* 987 F.2d 677, 680 (10th Cir. 1993) (If objection is made to the claim, the creditor has the ultimate burden of persuasion as to the validity and amount of the claim.)

-8-

claim under § 507(a)(1)(A), clearly challenging the legal sufficiency of IHFS's claim. The language inserted on the claim form concerning the factual allegations (1) that Ms. West was an AFDC recipient until 2002 at which time she became a direct support obligee, and (2) that her claim remains assigned to IHFS raises a question about whether she or IHFS is directly owed the past-due child support. The Court concludes that this question is more weighty than a mere denial,[28] meets the presumption of validity, and shifts the burden back to the IHFS to ultimately prove the validity of its claim as a § 507(a)(1)(A) or (B) level support priority claim.

There is no dispute in this case that the past-due child support owed by Penaran is a domestic support obligation (DSO) as defined at § 101(14A). The Court concludes that an ample record exists for this Court to find that the debt is a DSO since the child support debt is either owed to or recoverable by the debtor's spouse, child, or governmental unit.[29]

Section 507(a)(1) gives unsecured DSOs a first priority. This first priority for DSOs is further differentiated in subparts (A) and (B). If the DSO falls within § 507(a)(1)(A), it must be paid in full during the plan pursuant to § 1322(a)(2). If the DSO falls within § 507(a)(1)(B), it may be paid less than in full during the plan under § 1322(a)(4).[30] A debt that is a DSO must then be

---

[28] *See In re Lenz,* 110 B.R. 523 (D. Colo. 1990) (recognizing that an objection to a claim that raises only a legal issue is sufficient to rebut the prima facie validity of a creditor's proof of claim); *In re Circle J Dairy, Inc.*, 112 B.R. 297 (W.D. Ark. 1989) (the objector to a proof of claim may challenge the legal sufficiency of a claim by utilizing as evidence the content of the claim and its supporting documents.)

[29] *See* Keith M. Lundin, 5 CHAPTER 13 BANKRUPTCY, 3D EDITION, § 440.1, pp. 440-2-5 (2000 & Supp. 2007-1) (hereafter "Lundin"); Alan N. Resnick and Henry J. Sommer, COLLIER ON BANKRUPTCY ¶ 101.14A, p. 101-92-93 and ¶ 507.02A[1], p. 507-26 (16th ed.) (hereafter "Collier").

[30] Payment in full of § 507(a)(1)(B) DSOs is effectively deferred or delayed. To be sure, even a § 507(a)(1)(B) priority DSO remains due and owing after completion of the plan because it is non-dischargeable. *See* Lundin, § 441.1, p. 441-6 (cautioning against use of § 1322(a)(4)

-9-

identified as either one that is payable to or recoverable by the custodial parent, whether or not the claim is filed for her by a governmental unit, falling under § 507(a)(1)(A), or one that has been assigned to, or owed directly to or recoverable by, the governmental unit coming under § 507(a)(1)(B).[31]   The key, according to Collier, "is the party to whom the claim is owed," the individual or the governmental unit.[32]  If it is the latter, the claim is subordinated in priority to the former by virtue of § 507(a)(1)(B) which assigns a lesser priority within § 507(a)(1) to such claims.[33] And, if the claim is subject only to second support priority, it may be paid less than in full under the plan pursuant to § 1322(a)(4).[34]  DSO claims bearing a first support priority (payable to the custodial parent) must be paid in full during the plan term under § 1322(a)(2).  DSO debts having either § 507(a)(1) priority are non-dischargeable under § 523(a)(5), as debtor concedes.

The Court's evaluation of IHFS's claim is made difficult here because it is left to discern for itself the meaning of the "Support Calculation Worksheet" attached to the claim and the language used in describing the debt on the proof of claim form.  IHFS produced no witness to explain the nature of the claim, the Support Calculation Worksheet, or the amount of public assistance to be reimbursed by debtor.  Nor did the Court have the benefit of any pleadings or orders from the

_____

treatment because of the continuing accrual of interest on the DSO).

[31]  The language of § 507(a)(1)(B) which excludes DSOs *voluntarily* assigned by the spouse or parent for the purpose of collecting the debt suggests that a DSO voluntarily assigned to a governmental unit for the purpose of collecting child support is a § 507(a)(1)(A) priority DSO claim.  *See* Collier, ¶ 507.02A[1], p. 507-27.  DSOs involuntarily assigned to a governmental until would be a § 507(a)(1)(B) priority DSO claim.

[32]  Collier, ¶ 507.02A[1], p. 507-26.

[33]  *See* Lundin, § 440.1, p. 440-3.

[34]  *See* Lundin, § 440.1, p. 440-6.

divorce case relative to debtor's child support obligation other than the initial court-ordered $46 per week child support obligation. The Court's analysis is further hampered by what appears to be conflicting or ambiguous information in the proof of claim. For example, on the face of claim 1-2, IHFS appears to claim a § 507(a)(1)(A) priority as to the entire debt, a debt owed to the ex-spouse for child support. But the Support Calculation Worksheet attached thereto, indicates that some $3,400 is claimed owing to the IHFS.[35]

A review of the statutory basis for support claims assignments in Illinois places the priority status of claim 1-2 in doubt. Illinois law provides that once a parent begins receiving AFDC on account of her child, she is deemed to have assigned her child support to the state "up to the amount of support received."[36] The same statute also requires the agency to provide child support enforcement services to non-recipients of assistance, albeit for a fee.[37] As described, these latter "collection" services, while performed by the state as an agent for the support creditor, are not "assignments" in the legal sense. Yet, on claim 1-2, IHFS claims to be acting "pursuant to the IL Statutory Notice of Assignment" and asserts that "the statutory notice of assignment continues, but in May of 2002, the monies [sic] owed on this Domestic Support Order are due to this ex-spouse." The claim further recites that, as of May 31, 2002, Ms. West came off public assistance and this case became a "non-assistance based child support enforcement case." It is not apparent from the claim or the evidence presented at trial how much public assistance Ms. West received, over what period she received public assistance, how much was unreimbursed, or at what point in time debtor had

---

[35] Counsel for IHFS conceded at trial that this portion of the debt was a § 507(a)(1)(B) priority claim.

[36] 305 Ill. Comp. Stat. § 5/10-1 (2009).

[37] *In re Marriage of Paredes,* 371 Ill. App. 3d 647, 863 N.E.2d 788 (2007).

fully reimbursed the state for the public assistance Ms. West received. The Court notes that the "statutory notice of assignment" was not placed in evidence. Indeed, the statute itself may be the "statutory notice" of assignment by virtue of its recitation that recipients are "deemed" to have made assignment to IHFS.

Simply put, the Court cannot square the agency's acting "pursuant to the statutory notice of assignment" with the agency's merely being a collection or support enforcement agent for Ms. West. And, even if these statements were conceptually consistent, the Court cannot determine how much AFDC Ms. West received and how much of that public assistance remained to be reimbursed to the state on the date of filing. In short, debtor raises enough questions here to shift the burden of persuasion to IHFS. Unfortunately, IHFS presented no evidence that would have enlightened the Court and the parties on these remaining questions and, in the absence of such evidence, the Court must sustain the debtor's objection to the claim. IHFS failed to demonstrate by competent evidence that any part of this claim is "owed to or recoverable by a spouse" under § 507(a)(1)(A). Instead, the Court concludes from the record, such as it is, that IHFS's DSO claim is "assigned by a spouse . . . or [is] owed directly to or recoverable by a governmental unit under applicable non-bankruptcy law . . . ." as provided by § 507(A)(1)(B) and therefore is a second support priority claim eligible for § 1322(a)(4) treatment in debtor's plan.

Finally, the Court does not consider that Mr. Penaran met the presumption of validity in connection with the overall amount of the claim. His principal basis for disputing the total amount owed is the fact that, in 2004, he received a refund from the state of Illinois, indicating, at least to him, that he had paid his obligation in full or, at least that he was current. That he may have been "current" on support in 2004 does not mean that he was current on the petition date, or that he had

-12-

not run up a considerable amount of back support in the interim. The Court notes that his *weekly* support obligation more than tripled in 2002 and that a significant arrearage developed prior to 2002. He accrued nearly $8,000 a year in child support from 2003 through February of 2007, or approximately $33,000. Prior to that time, Penaran accrued an obligation of about $2,400 a year from 1991 through 2001, $920 for part of 2002, and $5,049 for the rest of 2002 (after the child support obligation was increased). In principal alone, that amounts to $32,369. From 1990 to 2002, he only paid $5,742. This is consistent with his testimony that he was gone from the United States for nearly 8 years during this period.

Nor can the Court conclude that debtor met the prima facie validity of the amount of the IHFS claim by his testimony that he received correspondence from the agency indicating his child support debt was some $30,000. That letter was not produced by Penaran at trial and the date of the letter or when it was received by Penaran was not disclosed. Nor did Penaran testify that this amount included accrued interest on the child support obligation. The Court thus concludes that the presumptive amount of the claim on the petition date is allowable even though its level of priority is not.[38]

The Court is always mindful of the exalted priority to which child support is rightly entitled. Congress made that crystal clear in BAPCPA, even if the statutes themselves are not as clear. That said, a DSO-based claim is no different than any other claim for purposes of being allowed and this Court is constrained to follow and apply the statutes, rules and case law in allowing such claims.

---

[38] These calculations further buttress the Court's previous conclusion that the claim cannot be presumed to be directly owed to Ms. West. Nothing on the claim detail sets out how much assistance she received or how collections from Penaran were applied against that amount. In the absence of any evidence on those points, the Court cannot determine that the debtor's obligation to the state on the assigned claim have been paid.

-13-

The Court also notes that relegation of this claim to second support priority status likely does Mr. Penaran little good. The interest accruing on this claim will continue.[39] That which he does not pay under the plan remains excepted from discharge should he complete the plan. Sixty months hence, he may owe as much money on this claim as he presently owes. Nevertheless, the Code as amended in 2005 allows this outcome and Mr. Penaran is certainly entitled to seek it.

Therefore, the Court SUSTAINS debtor's objection to claim 1-1 and 1-2 and allows the IHFS child support claim in the amount of $48,994.35 as a § 507(a)(1)(B) second support priority claim, the same to be payable as set forth in § 1322(a)(4).

B.     Confirmation[40]

I.     Facts

The debtor amended his plan on June 24, 2009 to provide for 60 monthly payments, the first 26 payments in the amount of $83.43 and the remaining 34 payments in the amount of $34.43. The debtor's employment has changed since the September hearing. Debtor left Seaboard at the end of October, 2009 and now works in Syracuse, Kansas for an unidentified individual as an independent contractor in some capacity with mobile homes. He testified that he currently earns $1,200 gross per month and is paid in cash.[41] There was no indication that debtor's monthly expenses of $1,600 as shown on Schedule J have changed since filing. Nonetheless, debtor testified that he is able to make the payments called for by his amended plan. If he completes this plan, his obligation to IHFS will by no means be paid in full. In fact, the agency can expect to receive about $3,300 in respect

_____

[39]  *See* note 30, *supra.*

[40]  Dkt. 28.

[41]  Debtor's wife, Lillia, does not work outside the home. Debtor's monthly take home pay from Seaboard as shown on Schedule I at the time of filing was $1,634.

-14-

of its claim. Interest will continue to accrue on the unpaid portion of the DSO claim and whatever

discharge Mr. Penaran receives will not absolve him of the duty to pay all of the DSO at some point.

With the conclusion that the entire IHFS claim is a second support priority claim under §

507(a)(1)(B) and entitled to § 1322(a)(4) plan treatment, so long as the debtor has dedicated all of

his disposable income to the plan, he need not pay the IHFS claim in full through the plan. The

debtor's amended plan can be confirmed. The Court cautions, however, that with Mr. Penaran's

recent change in employment, a wage withholding order may be unworkable. In addition, as of the

day of the December hearing, Penaran was not current on his plan payments, having failed to make

his November plan payment. He represented that he was in a position to make a partial plan

payment toward his $83 payment at the hearing with the balance to be paid at the end of the month.[42]

This leads the Court to again question the feasibility of his plan. But because the Trustee has yet

to file a motion to dismiss, and given the effort undertaken by all the parties to proceed with two

hearings in this case, the Court concludes that if Mr. Penaran makes the payments, the plan is

feasible and should be CONFIRMED.

    c.    <u>Motion for Stay Violation</u>[43]

The debtor filed this motion on June 17, 2009 seeking to stay IHFS from its continuing

garnishment of the debtor's wages for past-due child support. In support of this motion, the debtor

essentially contends that chapter 13 debtors should be protected from this form of collection when

they propose a plan that provides for payment of the DSO debt. IHFS relies on the stay exceptions

---

[42] The Trustee's plan payment history, however, reflects that Debtor only made partial plan payments in September and October. As of December 2009, debtor was more than 3 payments behind. *See* Trustee's Ex. A.

[43] Dkt. 21.

introduced in 2005 by BAPCPA and, in particular, § 362(b)(2)(B) and (C).[44] Section 362(b)(2)(B) provides that any DSO collection from non-estate property is excepted from the stay's ambit. Section 362(b)(2)(C) states unequivocally that any withholding of income that is property of the debtor or the estate for payment of a DSO under a judicial or administrative order is also excepted from the stay. There is no dispute that the child support obligation in this case arises under a judicial order and, as noted above, there is certainly no question that this debt is a DSO. Garnishment is a form of withholding debtor's income and, accordingly, is excepted from the stay by this subsection.[45] Had Congress intended that chapter 13 debtors be granted some more favorable treatment in this connection pre-confirmation, it could have articulated as much. It did not.

The debtor's motion also raises the suspension of debtor's Kansas driver's license as grounds for holding IHFS in contempt for violating the stay.[46] The debtor relies upon the anti-discrimination provisions of § 525 as a basis for its motion along with the provisions of the automatic stay itself. Nothing in the record other than this motion directly suggests that the debtor's license has been suspended and for what reason. The Court did enter a default order on May 22, 2009 directing the

---

[44] Dkt. 30.

[45] *See In re Gellington*, 363 B.R. 497 (Bankr. N.D. Tex. 2007) (State's post-petition garnishment of chapter 13 debtor to collect back child support was excepted from the automatic stay under § 362(b)(2)(C).); *In re Fort,* 412 B.R. 840 (Bankr. W.D. Va. 2009) (Florida's post-petition continuation of wage deduction order did not violate the automatic stay).

[46] This is the second such motion for stay violation. Prior to this motion, debtor filed a motion for stay violation and for reinstatement of his Kansas driver's license on April 28, 2009. Dkt. 11. The earlier motion was directed to the Kansas Department of Revenue, Division of Motor Vehicles. The IHFS did not respond to the motion and an order was entered May 22, 2009 granting the motion. Dkt. 15.

-16-

Kansas Department of Revenue to reinstate Penaran's driver's license.[47]  The Court takes judicial

notice of claim 2-1 filed by the City of Garden City, Kansas in the amount of $570 on November

13, 2009 for a traffic fine that arises out of Penaran's conviction for driving without a valid driver's

license.[48]  In short, it is not established by the evidentiary record before the Court that debtor's

Kansas driver's license was suspended due to his unpaid child support obligation or that IHFS

caused that suspension to occur.[49]

Even if the alleged Kansas license suspension were due to debtor's unpaid DSO, the

Bankruptcy Code allows such a suspension.  Section 362(b)(2)(D) expressly excepts from the ambit

of the stay withholding, suspending or restricting a driver's license "as specified in section

466(a)(16) of the Social Security Act."  That section mandates that states implement administrative

means of withholding such privileges as drivers' licenses to non-custodial parents who are in default

of their support obligations.[50]  If that is why Penaran's Kansas driver's license was suspended, there

is no basis for IHFS to be held in contempt for violating the stay.  Indeed, the Court believes that

the May 22, 2009 order was entered without an appropriate legal basis and granted IHFS's motion

---

[47]  Dkt. 15.  On October 23, 2009, the IHFS filed a motion to vacate the May 22 Order for lack of notice and cited the stay exceptions. Dkt. 61.  In that motion, IHFS avers that debtor's <u>Illinois</u> driver's license was suspended or revoked due to two driving under the influence (DUI) charges or convictions in Illinois.  IHFS further avers that <u>Kansas</u> suspended his license for driving on a suspended license.

[48]  The supporting documents attached to the City of Garden City claim indicate that Penaran was charged post-petition on July 13, 2009 with two counts of driving while suspended. That charge was amended to driving without a valid driver's license and he was convicted on August 5, 2009, fined $500 plus court costs.

[49]  Unfortunately, the debtor's driver's license records from neither the State of Illinois nor Kansas were offered or admitted into evidence.

[50]  *See* 42 U.S.C. § 656(a)(18).

-17-

to set it aside at the status conference conducted on December 14, 2009.[51]

The debtor's motion for stay violation against IHFS should be DENIED.

d.     Motion to Dismiss[52]

IHFS moved to dismiss this case on the grounds that the debtor misrepresented to the Court

the status of his dependents on Schedule I, filed with the petition on April 15, 2009.  Both the debtor

and the Trustee object to this motion.

I.     Facts

IHFS notes that, on Schedule I, the debtor claims three dependent children (ages 3, 9, and

19), along with his wife, Lillia as his dependents.  IHFS adduced evidence that showed conclusively

that at the petition date, at least two of the children resided with Juan Penaran and Maria Escamilla

in Syracuse, Kansas.  Debtor lived in Syracuse until May 17, 2009, when he moved to Johnson City.

According to Kansas Social and Rehabilitation Services (SRS) records introduced at trial, the

children received Healthwave Medicaid benefits from the state of Kansas on an application made

by Ms. Escamilla, Lillia's daughter who is married to Juan Penaran, debtor's son.  SRS records

indicate that Ms. Escamilla applied for the assistance and claimed that the two minor children live

at Syracuse with her and their blood brother, Juan.  According to Penaran's rebuttal testimony

however, the children reside in Johnson City but attend school in Syracuse.  The witness for the

Kansas SRS department testified that SRS did not receive notice that the Debtor and his family had

moved from Syracuse, a notice that the debtor was obligated to provide.  In addition, debtor and

---

[51]  The Court has issued a separate order withdrawing the Order (Dkt. 15) and granting IHFS's motion to set it aside (Dkt. 61). *See* Dkt. 75.

[52]  Dkt. 44.

-18-

Lillia applied for food stamp assistance in 2009 while the debtor was employed at Seaboard, but were denied because the debtor's income exceeded the eligibility level. In this application, they declared the two minor children as being domiciled with them at Johnson City.

   ii.  <u>Analysis</u>

  Illinois' motion to dismiss is predicated on its assertion that Penaran's schedules, documents to which he attested under penalty of perjury, are misleading. IHFS asserts that Penaran's conduct amounts to a lack of good faith sufficient to dismiss the case. Assuming that this set of facts would form a legal basis to dismiss the case or deny confirmation for lack of good faith, the Court questions whether the targeted statements are, in fact, false. IHFS complains that Penaran claimed his two minor children by Lillia Penaran as dependents on his Schedules I & J (and on B-22C) when those children were living with his adult son and supports that contention with SRS documents that demonstrate where the children lived at the petition date.

  While there appear to have been inaccurate statements made to SRS concerning the children's residence, the Court cannot conclude on the record before it that the children are not "dependents" of the debtor for Schedule I purposes. The Court notes that the debtor claimed that he lived in a four-person household on line 16 of Form B-22C. While this is not strictly accurate at the petition date, the Court concludes that debtor supports these children whether they live under his roof in Johnson or his son's roof in Syracuse. Webster's dictionary defines "dependent" as "one who relies on another for financial support or favor" and these children may well fall into that category. That the debtor and his family may have played fast and loose with the welfare system is troubling, but it is not a basis to dismiss his bankruptcy case, at least on the record as developed to date.

-19-

The Trustee questions whether IHFS may, after the September 16 confirmation hearing had been conducted, raise what she deems a further objection to confirmation based upon facts that Illinois had or could have obtained in advance of the September 16 trial. While the Court is very conscious of the importance of the finality of the record in chapter 13 cases, it notes that here confirmation was deferred until the Court could hear the objection to IHFS's claim. Indeed, this Court could not determine whether the amended plan was confirmable without determining the extent and priority of the claim.

Conclusion

The IHFS claim 1-2 is ALLOWED as a § 507(a)(1)(B) second support priority claim in the amount of $48,994.35. Therefore it need not be paid in full over the life of the plan. Instead the debtor's proposed treatment of the claim with partial payment under § 1322(a)(4) may be CONFIRMED. The Court again emphasizes that upon completion of the amended plan in 60 months, debtor will remain obligated for the unpaid child support debt with accrued interest, and that this debt, a DSO, will not be discharged.

The Court further concludes that garnishment of debtor's wages post-petition by IHFS is protected by the stay exception set out in § 362(b)(2)(C) and does not violate the stay. Withholding or suspending debtor's driver's license on account of unpaid child support (if this in fact even occurred) is also expressly contemplated by § 362(b)(2)(D) and does not constitute a violation of the stay. Debtor's motion for violation of the automatic stay is accordingly DENIED.

Finally, the Court concludes that IHFS's motion to dismiss should be DENIED for the reasons set forth above.

The Trustee shall prepare an order confirming debtor's first amended plan consistent with

Case 09-11043   Doc# 81   Filed 02/03/10   Page 20 of 21

this Court's ruling.

# # #

Case 09-11043    Doc# 81    Filed 02/03/10    Page 21 of 21